[Cite as *Caldwell v. Custom Craft Builders, Inc.*, 2025-Ohio-828.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| DANYETTE CALDWELL, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 113209 |
| v. | : | |
| CUSTOM CRAFT BUILDERS, INC., ET AL., | : | |
| Defendants-Appellants. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** March 13, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-887398

***Appearances:***

Myers Law, LLC and Daniel J. Myers, *for appellee*.

Mike Heller Law Firm and Michael A. Heller, *for appellants*.

LISA B. FORBES, P.J.:

{¶ 1} Acorn Plumbing & Heating, L.L.C. ("Acorn") and Oscar Lawrence, Jr. ("Lawrence") (collectively "Defendants") appeal from the trial court's journal entry, after a bench trial, finding in favor of Danyette Caldwell ("Caldwell") on her claims for breach of contract, conspiracy to commit fraud, and violations of the Consumer

Sales Practices Act ("CSPA").  After reviewing the facts of the case and pertinent law, we affirm the trial court's judgment in part, reverse the judgment in part, and remand this case to the trial court for a recalculation of damages.

**Facts and Procedural History**

{¶ 2}  On August 10, 2016, Acorn, which is a heating, ventilation, and air conditioning ("HVAC") company owned and operated by Lawrence, pulled a permit (the "Permit") to "replace 2 furnaces" at 20321 Lindbergh Ave., in Euclid (the "Property").  On August 12, 2016, Caldwell, who is the owner of the Property, entered into a contract (the "Contract") with Charles Allen ("Allen") to install two new Lennox furnaces at the Property.  According to the Contract, the total cost for labor, materials, and permits was $9,500.  The Contract further states that "[f]irst payment due $4,500 after permit is pulled."  Allen gave Caldwell a copy of the Permit when the Contract was signed, and Caldwell wrote a check for $4,500 made payable directly to Allen.  Allen, who is now deceased, told Caldwell that he was a representative of Acorn.  Ultimately, the Lennox furnaces were never delivered, and Caldwell hired two other companies to perform the HVAC work.

{¶ 3}  On October 13, 2017, Caldwell filed a complaint against the Defendants and other entities, including Allen.  Caldwell's complaint alleged breach of contract, conspiracy to commit fraud, and violations of the CSPA.  The Defendants' answer alleged that they never contracted with Caldwell to replace furnaces at the Property.  There were issues with service of the complaint and discovery disputes, which the trial court attempted to resolve.  In March 2019, the

case proceeded to a bench trial, and in December 2019, the court found in favor of Caldwell on all three of her claims, entering a $50,654 judgment against the Defendants jointly and severally. In November 2020, the court held a hearing regarding attorney fees and awarded Caldwell $20,627.50 in attorney fees.

{¶ 4} The Defendants appealed the judgments, and this court found that the trial court abused its discretion by denying the Defendants' motion to withdraw or amend their admissions during the parties' discovery disputes. *Caldwell v. Custom Craft Builders, Inc.*, 2021-Ohio-4173 (8th Dist.) ("*Caldwell I*"). *Caldwell I* vacated the trial court's judgments and remanded the case to the trial court for further proceedings. For a detailed review of the procedural and factual history up to the 2019 bench trial, see *Caldwell I*.

{¶ 5} In this opinion, we pick up where *Caldwell I* left off, because the discovery issues that were dispositive in *Caldwell I* are not at issue here. As *Caldwell I* noted in part, and as apropos to the instant appeal, "it is clear that the key issue is whether a relationship existed between Allen and [the Defendants] such that [the Defendants] can be held liable for the . . . written contract executed by Allen and Caldwell." *Caldwell I* at ¶ 47.

{¶ 6} On January 24, 2023, a second bench trial was held in this case. On May 26, 2023, the court issued a journal entry finding in favor of Caldwell on all three of her claims against the Defendants, jointly and severally, and awarded judgment in the amount of $58,804 plus interest. Additionally, on August 31, 2023, the court awarded attorney fees in favor of Caldwell and against the Defendants in

the amount of $27,117.90. It is from these orders that the Defendants appeal raising ten assignments of error for our review.

I. The trial court erred and/or abused their discretion in finding in favor of Plaintiff on all her claims and against Defendants.

II. The trial court erred in finding Defendants engaged in a civil conspiracy with Charles Allen.

III. The trial court erred in finding Defendants engaged in fraud.

IV. The trial court erred in admitting Plaintiff's contract with Charles Allen into evidence.

V. The trial court erred in admitting Plaintiff's check to Charles Allen into evidence.

VI. The trial court erred in finding Defendants violated the CSPA.

VII. The trial court erred in awarding attorneys fees and costs to Plaintiff.

VIII. The trial court erred in baldly rendering judgment against Defendants "jointly and severally[.]"

IX. The trial court's holding was against the sufficiency of the evidence.

X. The trial court's holding was against the manifest weight of the evidence.

{¶ 7} Because Caldwell's assignments of error are repetitive, we address them out of order and, at times, together.

**Trial Testimony**

**A. Danyette Caldwell**

{¶ 8} Caldwell testified that she purchased the Property on September 21, 2015, and she hired "Charles Allen and Acorn" to do HVAC work at the Property. Asked if she believed Allen had "some affiliation with some company," Caldwell

answered, "Yes." Asked the basis for this belief, Caldwell testified as follows: "Well, when . . . it was time for the down payment to be paid and [Allen] produced the permit, it had Acorn on there. I asked him, you know, why was the names different, and he said he worked for Acorn and that's how he gets his permits . . . ." Caldwell testified that the HVAC work she was going to have done was "[t]wo furnaces installed," and she made a $4,500 down payment via check to Allen for this work, and she expected to pay a total of $9,500. Caldwell further testified that she "ended up paying another company to install."

{¶ 9} Caldwell testified as follows about whether this "HVAC project" under the Contract worked out:

> Well, when [Allen] first came to the home with the furnaces and the duct work, like, the materials things, upon first notice, the furnaces were not the Lennox brand that we agreed upon. So things began there. We had a conversation about that. He said he would take them back, and . . . refund — he did say that they — a little bit later on said that they were — cost too much, but . . . .

{¶ 10} Caldwell explained that Lennox brand furnaces were "specifically called out . . . in the contract that we had." Caldwell further testified that she later found out that "the BTUs [of the furnaces that Allen attempted to deliver] were way too much for my home." Caldwell again testified that Allen said he was going to give her a refund, but she never got the $4,500 back, and Allen never delivered the Lennox furnaces or any other furnaces.

{¶ 11} Asked what caused her to write the $4,500 down payment check to Allen, Caldwell testified as follows: "The permit. Once he provided me with the

permit is when I paid him the $4,500. There was a conversation. You know, I asked him why was the name difference. He just told me that he worked for Acorn, and that's when I went on and paid him the deposit."

{¶ 12} Caldwell filed a complaint with the Euclid building department and she filed a police report. She also called Acorn and spoke with someone named Sahara, who Caldwell believed to be Lawrence's daughter and "the contact person" at Acorn.

{¶ 13} Caldwell testified that she also had "rough-in plumbing" work done at the Property by Acorn and specifically by a person named "Ramar." Caldwell further testified that the permit for the plumbing work was pulled by Acorn on August 11, 2016, which is one day after the permit for the HVAC work was pulled by Acorn. Caldwell also testified that she paid for the plumbing work via a check written to "Ramar Womack" and that the contracts for the plumbing work were between her and Ramar, or more specifically, Ramar's company S&G Plumbing. According to Caldwell, Acorn was not referenced on these plumbing contracts. Caldwell testified that "it was explained to" her that Ramar was "the contractor for Acorn. . . . [Acorn is] like the overhead, I guess, the overseer." Caldwell testified that she had no issues with the plumbing work.

{¶ 14} Asked what she said to Sahara when Caldwell contacted her, Caldwell testified as follows:

A: I just explained that — basically that Charles Allen had not returned the money, he never did the work, never came back with the furnaces,

and we needed a resolution on what to do next because my money is floating around out there. I still need — the work still needs to be done.

Q: And did anyone at that time, anyone from Acorn, Sahara, anyone else, state we don't — we don't know who Charles Allen is?

A: No.

Q: Did she deny any involvement by Acorn and the project?

A: No.

Q: Did you speak with her over the phone? How did you communicate with her?

A: Oh, over the phone. She had me send her . . . the contract and things, and then that was basically it. She said she would get back with me.

{¶ 15} Asked why she contacted "Sahara as opposed to anyone else in the world," Caldwell testified that "the building department provided me with her number." According to Caldwell, Acorn never refunded her money and never did any HVAC work at the Property. Caldwell testified that neither Lawrence nor anyone else from Acorn contacted her after she spoke to Sahara. Caldwell testified that she canceled the permit that Acorn pulled for HVAC work at the Property so that another company could pull a permit and she could get the furnaces installed. Caldwell testified that two companies, Air Serv and Smylie One, eventually "did the HVAC work," and she paid "[a]pproximately about $15,000" to "get the HVAC work finished." Caldwell presented a "quote" or "proposal" for $2,850 and another document listing an amount of $12,318. Caldwell testified that she paid these amounts.

{¶ 16} Caldwell testified that Lawrence "said he didn't know Charles Allen and he — that wasn't his employee."

{¶ 17} On cross-examination, Caldwell testified that Allen was referred to her by J.D. Carpentry. Caldwell sent a text message to Allen on June 28, 2016, asking to "separate the estimates one for plumbing and one for heating and plumbing" for the Property. According to Caldwell, she had "back and forth" conversations with Allen "to get to the terms of the contract." At no time during these "negotiations" was Acorn mentioned. Caldwell testified that she first heard the name "Acorn" when she saw the HVAC permit. Caldwell further testified that Ramar Womack was referred to her by her friend "Chris." According to Caldwell, her "negotiations" with Ramar were "in a similar period of time" as her negotiations with Allen.

{¶ 18} Caldwell testified that, during her negotiations with Ramar, Ramar mentioned the name "Acorn Heating & Cooling . . . [o]nce the permit was pulled."

{¶ 19} Caldwell testified that when she spoke with Sahara, which was only once, Sahara did not say that Allen was an employee or an agent of Acorn. Caldwell further testified that there is no mention of Acorn or Lawrence in the Contract she signed with Allen. Caldwell also testified that there is no mention of Acorn or Lawrence on the $4,500 check she wrote to Allen for the down payment on the HVAC work.

{¶ 20} According to Caldwell, although she negotiated with Allen and Ramar regarding work at the Property "right about the same time," she never saw Allen and

Ramar together or at the same time, and to her knowledge, neither Ramar nor Allen knew that the other was also doing work, or had contracted to do work, at the Property.

**B. Oscar Lawrence (as if on cross-examination)**

{¶ 21} Caldwell's attorney called Lawrence to testify as if on cross-examination during Caldwell's case-in-chief. Lawrence testified that he is the owner of Acorn, which is in the HVAC business. According to Lawrence, he does not know who Allen is and Allen had never worked for Acorn or Lawrence. Asked if he told "the other attorneys" at a case-management conference "a different story," Lawrence answered, "That isn't true." Lawrence agreed that Acorn "did plumbing work" at the Property "at about the same time" that Caldwell contracted with Allen to do the HVAC work. Lawrence testified that Acorn puled a permit for the plumbing job and Acorn pulled a permit for the HVAC job at the Property.

{¶ 22} According to Lawrence, Ramar "got that [plumbing] job for Acorn" and Caldwell paid Ramar directly. Asked if Ramar "was supposed to pay Acorn" for that job, Lawrence answered, "Yes." This colloquy continued:

> Q: So Ramar, your employee, signs up jobs using his company's name, but they're actually Acorn jobs?
>
> A: Yes.
>
> Q: And there's no mention of Acorn anywhere in that agreement, right?
>
> A: No.
>
> Q: And the only — the only thing in writing that we see that mentions Acorn for either the heating or the plumbing job, that's the permits, right?

A: Yes.

. . .

Q: . . . In your opinion, was there ever a contract for the heating portion of the job . . . between [Caldwell] and Acorn?

A: No.

. . .

Q: Despite the fact that there was no contract, you still pulled a permit for that work?

A: Yes.

Q: And you paid for that permit some money, didn't you?

A: Yes.

Q: Looks like . . . it says the permit fee was $101. Does that sound accurate?

A: Yes.

Q: Do you make a habit of paying $100 on jobs that you don't actually have yet?

A: Yes.

. . .

Q: Okay. So there's not necessarily some Acorn contract that you use with all of your customers, right?

A: Not necessarily.

. . .

Q: And so you would agree also that your employees, you allowed your employees to make the contract between them and their — them and the customer, right?

A: Sometimes.

. . .

Q:  Well, you allowed Ramar to do that with Ms. Caldwell, right?

A:  Yes.

Q:  And you did the same thing when it came to Charles Allen and the heating contract, didn't you?

A:  No, sir.  I never knew Charles Allen.

{¶ 23} Lawrence testified that Sahara is his daughter, and she is authorized to receive phone calls on behalf of Acorn.  Lawrence testified that he became aware of the situation at issue in this case when he "received some legal papers that notified [him] that [he] had to come to court."  Lawrence testified that he "verbally" cancelled the permit for the HVAC work at the Property, although he did not remember the date this was done.  Asked why he cancelled the permit if he was not aware of the situation until Caldwell filed this lawsuit, Lawrence explained as follows: "I knew to cancel it because I heard somewhere, some way, that [Caldwell] had given the contract to Charles Allen.  I said I'm going to cancel my permit because I don't have anything to do with Charles Allen because I don't know him, he doesn't work for me."  This line of testimony continued:

Q:  In order to apply for the heating permit, you had to know the scope of work, right?

A:  Yes.

Q:  Okay.  And in order to apply for the plumbing permit, you had to know the scope of work, right?

A:  Yes.

Q:  And somehow you know the scopes of those works before the contracts were even signed by [Caldwell], right?

A: Yes.

Q: Would it be accurate to say that you understood that if you were to pull the heating permit for the job that you were going to get the heating project?

A: Yes.

Q: And so you pulled the heating permit?

A: Yes.

Q: It was your understanding that that was actually a condition of you getting the heating job . . . .?

A: Yes.

Q: And you fulfilled that condition?

A: Yes.

Q: So in your mind at that time, you — at the time you did the permit, you had the heating job, right?

A: Yes.

Q: So if Charles Allen wasn't your employee, when exactly were you planning on getting someone out there to talk to [Caldwell] and sign her up?

A: When — when I heard that someone else was doing the work on the . . . HVAC, but for [Caldwell], I just canceled my permit because I had — I had no right to be there.

. . .

Q: So you pull a permit for this job on August 10th, believing you got the job, and then you never sent an employee out, you never get a contract signed, you never ask for payment, and . . . . You never sent an employee out to talk to [Caldwell] then, is that what you're saying?

A: I had to wait until [Caldwell] invited me in to make an estimate cost or a true estimate cost of the job and we agreed on the contract, and that never happened.

### C. Samantha Vajskop

{¶ 24} Samantha Vajskop ("Vajskop") testified that she is an attorney and she used to work for the firm who represented Caldwell at trial in the case at hand. In January 2018, Vajskop attended a case-management conference in relation to this case. Lawrence, who was representing himself pro se at the time, also attended this case-management conference. Service of the complaint had not been perfected on Allen, and Vajskop asked Lawrence if he knew where Allen was. Lawrence confirmed that he knew Allen and that Allen "had worked for" Lawrence, but Lawrence did not know where Allen currently was. According to Vajskop, Lawrence "actually confirmed that [Allen] did work for [the Defendants], because that was the question that I had." Asked if Lawrence indicated that Allen worked for Lawrence or Acorn "with regards to the job of Caldwell," Vajskop answered, "I don't believe that came up at the case management conference." Vajskop also testified about an affidavit that she prepared in relation to issues concerning service of the complaint. This affidavit states in part as follows: "Mr. Lawrence confirmed to us that he knew Defendant Allen. Mr. Lawrence also told us that Defendant Allen used to work for him as an employee, but that Defendant Allen did not work for him anymore."

### D. Oscar Lawrence

{¶ 25} Lawrence testified on behalf of the Defendants in their case-in-chief that Acorn "did a plumbing job" for Caldwell. Ramar "found the job" and performed the work. According to Lawrence, Ramar needed Acorn to get the permit and supervise the job. In exchange, Ramar paid Acorn although Lawrence testified that

he "forgot" how much Acorn was paid. Lawrence testified that when he pulled the permit with the building department of Euclid, he had to provide "the address of the house, the owner, and what you're doing, whether new work, repair work, replacement."

{¶ 26} Lawrence testified that Ramar "came to" him regarding the plumbing work at the Property, and this is the "usual way" that Acorn gets work. Lawrence has "been in business a long time. They call me all the time." Lawrence testified that he typically gets permits and supervises jobs. "I have a number of people. In this case, it was Ramar, but I don't have any full-time employees. I may use a person for one week, two weeks, or a month and that's it, until I get some other work."

{¶ 27} Lawrence testified that he pulled a permit for an HVAC job at the Property although he did not have the job yet. Asked why he pulled the permit, Lawrence testified that a "man named Nijore contacted me." Lawrence got "information about the job" and pulled the permit. Lawrence testified that he "was told that [he] would get the job" if he pulled the permit. According to Lawrence, all he knew this person by was the name "Nijore." This testimony continued as follows:

> Q: Whoever that person was that caused you to have the understanding about the heating portion of the job, you said their name was Nijore?
>
> A: Yes.
>
> Q: Okay. You don't know if that's a nickname or a legal name, right?
>
> A: No.
>
> Q: And you said you never met Charles Allen?
>
> A: Yes, I never met him.

Q: So for all you know, Nijore could be Charles Allen?

A: Could be. I know the man as Nijore.

Q: And you've known Nijore for 20 years?

A: Yes.

. . .

Q: So did you believe then that you pulled the permit that job is an Acorn job, Nijore was going to do it?

A: No, I was going to do it.

Q: You personally?

A: I have men I supervise to do the work.

Q: Men like Ramar?

A: Yeah, like Ramar.

. . .

Q: How do we make sure people are qualified when licensed contractors let people that aren't licensed work under their permit?

A: The licensed contractor is responsible for the job.

Q: Are you going to take responsibility for the heating project at [Caldwell's] house?

A: I was going to. But when she gave the job to someone else, I canceled my permit.

{¶ 28} Lawrence again testified that he did not know Allen, he did not get the HVAC job at the Caldwell Property, and he did not receive any payment regarding the HVAC job at the Caldwell Property.

**Law and Analysis**

**A. Admissibility of Evidence**

{¶ 29} In the Defendants' fourth assignment of error, they argue that the trial court "erred in admitting [Caldwell's] contract with . . . Allen into evidence." In the Defendants' fifth assignment of error, they argue that the trial court "erred in admitting [Caldwell's] check to . . . Allen into evidence."

{¶ 30} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the [factfinder]." Evid.R. 403(A)

{¶ 31} An abuse of discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). The Ohio Supreme Court explained that an abuse of discretion "involves more than a difference of opinion." *State v. Weaver*, 2022-Ohio-4371, ¶ 24. That is, a trial court's judgment that is "profoundly and wholly violative of fact and reason" constitutes an abuse of discretion. *Id.*

{¶ 32} The Defendants argue that because they were not a party to the Contract or the $4,500 check that Caldwell wrote to Allen and because they were unable to cross-examine Allen, these two documents "should have been excluded" from trial. The Defendants summarily conclude that these documents are irrelevant, and in the alternative, they "improperly prejudiced" the Defendants pursuant to Evid.R. 403(A). Indeed, Evid.R. 403(A) is the only law the Defendants cite under these two assignments of error.

{¶ 33} The Defendants' arguments are not well-taken. Caldwell alleged that the Defendants breached the Contract and that her damages included the $4,500 down payment she made that was never returned to her. The Contract and down payment are, thus, relevant to this claim. Furthermore, we cannot say that the danger of unfair prejudice outweighed the probative value of admitting at trial the Contract and method of payment that are the subject of a breach-of-contract claim. *See* Evid.R. 1002 ("To prove the content of a writing, . . . the original writing . . . is required."); *Castle Hill Holdings, L.L.C., v. Al Hut, Inc.*, 2006-Ohio-1353, ¶ 30 (8th Dist.) ("[T]o prove the contents of a writing, the 'best evidence rule' requires that the actual document, or an exact duplicate thereof, be introduced.").

{¶ 34} Accordingly, the Defendants' fourth and fifth assignments of error are overruled.

## B. Sufficiency of the Evidence

{¶ 35} The Defendants' ninth assignment of error challenges the sufficiency of the evidence presented at trial concerning all of Caldwell's claims. The

Defendants' eighth assignment of error challenges the sufficiency of the evidence presented at trial concerning Lawrence's personal liability. The Defendants' seventh assignment of error challenges the sufficiency of the evidence presented at trial concerning attorney fees.

{¶ 36} "When reviewing the sufficiency of the evidence in civil cases, the question is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent, credible evidence." *Mtge. Elect. Registration Sys. v. Mosley*, 2010-Ohio-2886, ¶ 28 (8th Dist.) "Put more simply, the standard is 'whether the verdict [is] one which could be reasonably reached from the evidence.'" (Bracketed text in original.) *Id.*, quoting *Ruffo v. Shaddix*, 1999 Ohio App. LEXIS 2608 (8th Dist. June 10, 1999). "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, . . . evidence must still exist on each element" of each claim. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19.

### 1. Personal Liability of Lawrence

{¶ 37} In the Defendants' eighth assignment of error, they argue that the trial court erred by "baldly rendering judgment against Defendants 'jointly and severally.'" Specifically, the Defendants argue that the court erred by holding Lawrence personally liable for Acorn's conduct.

{¶ 38} Generally, an individual is immune for the wrongful acts of a corporate entity. *See Belvedere Condominium Unit Owners' Assn. v. Roark Cos.*, 67 Ohio St. 3d 274, 287 (1993). An exception to this rule is found in the "alter ego

doctrine" and the concept of "piercing the corporate veil." *Id.* The *Belvedere* Court set forth this test as follows:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289. Ohio courts have applied *Belvedere's* test concerning piercing the corporate veil to limited liability companies like Acorn. *See United States Bank Natl. Assn. v. MMCO, LLC*, 2021-Ohio-4605 (8th Dist.) (applying *Belvedere's* pierce-the-corporate-veil test to a limited-liability company); *Best Fin. Sols., L.L.C. v. Tifton Custom Packing, L.L.C.*, 2024-Ohio-4458 (1st Dist.) (applying *Belvedere's* pierce-the-corporate-veil test to a limited-liability company).

{¶ 39} Upon review, we find that there is no evidence in the record as to how complete or incomplete Lawrence's control of Acorn was; there is no evidence in the record that Lawrence's control over Acorn was exercised in a manner to commit fraud or an illegal act; and, there is no evidence in the record that Lawrence's control over Acorn resulted in an injury to Caldwell. Lawrence testified that he is the owner of Acorn and he is the "head person in charge." However, the Ohio Supreme Court has held that "[p]iercing the corporate veil . . . remains a 'rare exception,' to be applied only 'in the case of fraud or certain other exceptional circumstances.'" *Dombroski v. WellPoint, Inc.*, 2008-Ohio-4827, ¶ 17, quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Lawrence's testimony that he owns and is in

charge of Acorn is insufficient to pierce the corporate veil. *See, e.g., Ohio City Orthopedics, Inc. v. Med. Billing & Receivables, Inc.,* 2003-Ohio-1881, ¶ 16 (8th Dist.) ("Appellant set forth no evidence demonstrating that [the person] was so intertwined with [the corporation] so as to make it her alter ego. [T]he mere fact that [the person] is the sole shareholder and officer of the corporation is not sufficient evidence to demonstrate that . . . the corporate veil should be pierced. Something more must be shown.").

{¶ 40} Accordingly, we find that the trial court erred by granting judgment against the Defendants jointly and severally, and specifically by granting judgment against Lawrence personally, because there is insufficient evidence to pierce the corporate veil. The Defendants' eighth assignment of error is sustained.

### 2. Liability of Acorn

#### a. Breach of Contract

{¶ 41} We next turn to the Defendants' ninth assignment of error, which states that the trial court's "holding was against the sufficiency of the evidence." Because many of the Defendants' assignments of error are duplicative, we review the trial court's finding in favor of Caldwell on her breach-of-contract, CSPA violations, and conspiracy-to-commit-fraud claims under the ninth assignment of error and a sufficiency-of-the-evidence standard of review.[1]

---

[1] We note that the Defendants' tenth assignment of error argues that the trial court's finding in favor of Caldwell was against the manifest weight of the evidence as to her CSPA violations and conspiracy-to-commit-fraud claims. A careful reading of the Defendants' appellate brief reveals that there is no challenge to the weight of the evidence regarding Caldwell's breach-of-contract claim.

{¶ 42} To succeed on a breach-of-contract claim, a plaintiff must prove, by a preponderance of the evidence, that a contract existed; the plaintiff performed; the defendant failed to perform its contractual obligations; and the plaintiff suffered damages as a result of the breach. *Carbone v. Nueva Constr. Group*, 2017-Ohio-382, ¶ 14 (8th Dist.).

{¶ 43} In the case at hand, it is undisputed that Caldwell and Allen entered into the Contract at issue. Acorn, via Lawrence or any other representative, did not sign the Contract and did not expressly agree to do HVAC work at Caldwell's house. Therefore, to show that a contract existed between Caldwell and Acorn, Caldwell needed to present evidence that Allen was acting as an agent for Acorn at the time he entered into the Contract with Caldwell.

{¶ 44} To bind a party under the doctrine of apparent agency, the evidence must show:

> (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.

(Cleaned up.) *Master Consol. Corp. v. Bancohio Natl. Bank*, 61 Ohio St.3d 570, 576 (1991). When applying this test for apparent agency, the "acts of the principle, not the agent, create apparent authority." *Caston v. The Woodlands of Shaker Hts.*, 2024-Ohio-2267, ¶ 17 (8th Dist.). A "'principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct

has clothed the agent with the appearance of authority and not where the agent's own conduct has created the apparent authority.'" (Citation omitted.) *Logsdon v. Main-Nottingham Inv. Co.,* 103 Ohio App. 233, 242 (2d Dist. 1956).

{¶ 45} In the instant case, Caldwell presented evidence that, on the day before Caldwell and Allen entered into the Contract, Acorn pulled an HVAC permit for the Property. Caldwell testified that Allen showed her the Acorn permit when she and Allen signed the Contract. During Lawrence's testimony, he was asked, "In order to apply for the heating permit, you had to know the scope of the work, right?" Lawrence answered, "Yes." Lawrence was further asked if his understanding was that if Acorn pulled the permit, Acorn would get the Caldwell HVAC job. Lawrence answered, "Yes." Lawrence was next asked, "So in your mind — at the time when you [pulled] the permit, you had the heating job, right?" Lawrence again answered, "Yes." There is inconsistent testimony regarding whether Lawrence knew Allen. Although Lawrence testified that a man named "Nijore" caused Acorn to pull the HVAC permit for the Property, the evidence in the record is undisputed that Allen had a copy of Acorn's HVAC permit for the Property and that Allen gave a copy of this permit to Caldwell.

{¶ 46} Upon review of the trial testimony and exhibits, we find sufficient evidence that Acorn held Allen out, at least to Caldwell, as having the authority to act on behalf of Acorn. Thus, Caldwell had reason to believe that Allen possessed the authority to act on behalf of Acorn. Accordingly, a "preponderance of the

evidence" was presented at trial that a contract, via the doctrine of apparent agency, existed between Caldwell and Acorn.

{¶ 47} It is undisputed that Caldwell paid Allen $4,500 under the Contract, Allen and Acorn failed to perform the HVAC work, and Caldwell suffered damages as a result. Therefore, we find that the trial court's judgment relating to Caldwell's breach-of-contract claim against Acorn is supported by sufficient evidence in the record.

{¶ 48} The Defendants' ninth assignment of error is overruled in part as related to Caldwell's breach-of-contract claim against Acorn.

### b. CSPA

{¶ 49} The CSPA, which is codified in R.C. Ch. 1345, "prohibits suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03." *Johnson v. Microsoft Corp.*, 2005-Ohio-4985, ¶ 24. Relevant here are "unfair or deceptive" acts, and not "unconscionable acts or practices," because the trial court's journal entry finding in favor of Caldwell states that Acorn and Lawrence "engaged in . . . acts and practices, which this Court hereby declares as unfair or deceptive acts in violation of the CSPA . . . ."

{¶ 50} Unfair or deceptive acts are "those that mislead consumers about the nature of the product they are receiving . . . ." *Id.* A nonexhaustive list of "deceptive" acts is found in R.C. 1345.02(B)(1)-(10). "Although R.C. 1345.02 does not use the word 'falsity' or 'false,' each and every deceptive practice listed in . . . R.C. 1345.02

describes a misrepresentation of the truth, i.e., a falsity." *Grgat v. Giant Eagle, Inc.*, 2019-Ohio-4582, ¶ 15 (8th Dist.). Additionally, R.C. 1345.05(B)(2) authorizes the Ohio attorney general to adopt rules "defining with reasonable specificity acts" that violate the CSPA. Ohio courts have stated that the Ohio Administrative Code ("OAC"), which is the Ohio attorney general's "rules," "provides additional examples of acts or practices that may be considered deceptive under the CSPA." *Grgat* at ¶ 27. "[C]ourts have declined to interpret [R.C. 1345.02(B)] in a manner that would impose strict liability." *Id.* at ¶ 17. "Rather than applying strict liability, courts have held that whether a supplier's act or omission is a violation of the CSPA depends on how a reasonable consumer would view it." *Id.* at ¶ 18.

{¶ 51} In its journal entry finding in favor of Caldwell, the trial court listed 11 "acts" that Acorn[2] engaged in that it found "unfair or deceptive . . . in violation of the CSPA . . . ." The first six of those acts allegedly violated the OAC. For example, the trial court found that Acorn "failed to provide the receipt in the form or containing the language required by OAC 109:4-3-07(B) for the initial payment made by" Caldwell. OAC 109:4-3-07(B), in turn, states as follows:

> At the time of the initial deposit the supplier must provide to the consumer a dated written receipt stating clearly and conspicuously the following information:

---

[2] The trial court listed "acts" that Acorn, as well as Lawrence, engaged in. We previously determined that Lawrence was not personally liable to Caldwell because she failed to present sufficient evidence to pierce the corporate veil. Therefore, in the remainder of this opinion, we focus on the trial court's findings relating to Acorn only.

(1) Description of the goods and/or services to which the deposit applies, (including model, model year, when appropriate, make, and color);

(2) The cash selling price and the amount of the deposit. "Cash selling price", for purpose of this rule, as it relates to motor vehicle transactions, includes all discounts, rebates and incentives;

(3) Allowance on the goods to be traded in or other discount, if any;

(4) Time during which any option given is binding;

(5) Whether the deposit is refundable and under what conditions, provided that no limitation on refunds in a layaway arrangement may be made except as provided by sections 1317.21 to 1317.23 of the Revised Code; and

(6) Any additional costs such as storage, assembly or delivery charges.

{¶ 52} The remaining five acts that the court found in its journal entry to be "unfair or deceptive" cover a variety of miscellaneous conduct. For example, the court found that Acorn "made representations at trial that contradicted [Lawrence's] prior representations concerning the prior status of an individual as an employee of [Acorn], which causes confusion."

{¶ 53} Upon review, we find no evidence in the record that Acorn engaged in any conduct that was prohibited by the CSPA as "unfair or deceptive." *See Tsirikos-Karapanos v. Ford Motor Co.*, 2017-Ohio-8487, ¶ 36 (8th Dist.), quoting *Warren v. Denes Concrete, Inc.,* 1995 Ohio App. LEXIS 812 (9th Dist. Mar. 1, 1995) ("'A CSPA claim will not be successful unless the [defendant's] performance amounted to a deceptive, unfair, or unconscionable act.'").

{¶ 54} The evidence in the record shows that Acorn pulled the permit for HVAC work at Property after someone named "Nijore" contacted Lawrence about

the job. Asked if "Nijore could be Charles Allen," Lawrence answered, "Could be. I know the man as Nijore." The evidence further demonstrates that Caldwell paid Allen a down payment of $4,500, that the furnaces she contracted for were never provided or installed, and that she did not received a refund of her $4,500.

{¶ 55} Ohio courts consistently hold that not every breach of contract amounts to a violation of the CSPA. *Tsirikos-Karapanos* at ¶ 38. On the other hand, "[w]hen a supplier knowingly commits a breach, the breach is likely also an unfair or deceptive act." *Cartwright v. Beverly Hills Floors, Inc.*, 2013-Ohio-2266, ¶ 17 (7th Dist.). Nothing in the record shows that, when Acorn pulled the HVAC permit, Acorn knew that Allen, or Acorn for that matter, would breach the Contract. Furthermore, nothing in the record shows that, when Acorn pulled the HVAC permit, Acorn acted in a manner that "misled consumers about the nature of the product they are receiving." *See Johnson*, 2005-Ohio-4985, at ¶ 24; R.C. 1345.02(B). In other words, nothing in the record shows that, when Acorn pulled the permit, Acorn acted deceptively or unfairly.

{¶ 56} Accordingly, the trial court erred by finding in favor of Caldwell on her claim that Acorn violated the CSPA because there is insufficient evidence in the record to show that Acorn acted deceptively or unfairly. The Defendants' ninth assignment of error is sustained in part as related to Caldwell's claim against Acorn for violations of the CSPA.

### c. Conspiracy to Commit Fraud

{¶ 57} To succeed on a claim for conspiracy to commit fraud, a plaintiff must show that there is a "civil conspiracy" and that there is a "fraud." *See Morrow v. Reminger & Reminger Co., L.P.A.*, 2009-Ohio-2665, ¶ 40. "A civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Id.* A "civil conspiracy" is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987). The elements of fraud are:

> (1) a representation of fact (or where there is a duty to disclose, concealment of a fact); (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation (or concealment); and (6) resulting injury proximately caused by the reliance.

*Malek v. Eresearch Tech., Inc.,* 2022-Ohio-3330, ¶ 24 (8th Dist.).

{¶ 58} Similar to the reasons that we found no evidence of deception on behalf of Acorn, we also find that there is no evidence that Acorn conspired with Allen and there is no evidence that Acorn engaged in fraud. The evidence in the record shows that Acorn pulled the permit for the HVAC job at the Property. There is no evidence in the record that Acorn "maliciously combined" with Allen to injure Caldwell. Furthermore, there is no evidence that Acorn had knowledge of a "representation of fact . . . made falsely" or was reckless in that regard, and there is no evidence that Acorn acted "with the intent of misleading" Caldwell "into relying"

on a false representation of fact. In other words, nothing in the record establishes that Acorn was in cahoots with Allen regarding an underlying tort of fraud. *See Marriott Corp. v. Lerew*, 2005-Ohio-5336, ¶ 24 (8th Dist.) ("[T]here can be no cause of action for conspiracy to commit fraud, because there is no underlying unlawful act. [The plaintiff] cannot prove conspiracy to commit fraud without first proving fraud, the underlying unlawful act.").

{¶ 59} Accordingly, the trial court erred by finding in favor of Caldwell on her claim that Acorn conspired with Allen to commit fraud because the evidence in the record is insufficient to support such a claim. The Defendants' ninth assignment of error is sustained in part as related to Caldwell's claim against Acorn for conspiracy to commit.

### d. Attorney Fees

{¶ 60} In the case at hand, the court awarded $27,117.90 in attorney fees in favor of Caldwell and against the Defendants. The court's August 31, 2023 journal entry awarding attorney fees does not expressly state the legal theory under which the court awarded the fees. We surmise from the journal entry that the court awarded the fees under the CSPA, because the court references that Caldwell's attorney "is a consumer lawyer" who practices in the area of "consumer protection." In any event, upon review, we find that the court erred by awarding Caldwell attorney fees in this case.

{¶ 61} "Ohio follows the 'American Rule,' which provides that a prevailing party in a civil action may not generally recover its attorney fees as part of the 'costs

of litigation' unless attorney fees are provided for by statute, the nonprevailing party acts in bad faith or there is an enforceable contract" expressly providing that the losing party pays the prevailing party's attorney fees. *Rayco Mfg. v. Murphy, Rogers, Sloss & Gambel*, 2019-Ohio-3756, ¶ 5 (8th Dist.).

{¶ 62} Caldwell successfully litigated her breach-of-contract claim against Acorn via the doctrine of apparent authority. However, the Contract does not expressly provide for an award of attorney fees. We reversed the judgment in favor of Caldwell under the CSPA and her claim for conspiracy to commit fraud, and as a result, Caldwell is not entitled to attorney fees under these causes of action. Caldwell does not argue, nor did the trial court find, that an award of attorney fees is provided by statute other than the CSPA, and there is no evidence in the record that Acorn acted in bad faith.

{¶ 63} Accordingly, we sustain the Defendants' seventh assignment of error and vacate the attorney-fee award in this case

{¶ 64} In summary, the evidence presented at trial showed that Acorn pulled a permit for HVAC work at the Property in anticipation of getting the job. Caldwell expressly contracted with Allen for the HVAC work, and through the extension of apparent authority, we find that she also contracted with Acorn. Caldwell paid Allen $4,500, and neither Allen nor Acorn performed the work. Given the evidence in the record, this is a simple breach-of-contract case. The trial court's judgment is not supported by sufficient evidence in the record as to all claims against Acorn and Lawrence other than Caldwell's breach-of-contract claim against Acorn only. The

attorney-fees award is vacated because it is not warranted given the disposition of this appeal. The Defendants' fourth and fifth assignments of error are overruled, the Defendants' ninth assignment of error is sustained in part and overruled in part, and the Defendants' seventh assignment of error is sustained in its entirety. The remaining assignments of error are moot pursuant to App.R. 12(A)(1)(c).

{¶ 65} Judgment affirmed in part and reversed in part. This case is remanded to the trial court to determine the correct amount of damages to award Caldwell on her breach-of-contract claim against Acorn. "As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty . . . ." *Rhodes v. Rhodes Industries, Inc.,* 71 Ohio App.3d 797, 808 (8th Dist. 1991). *See also Decastro v. Wellston City School Dist. Bd. of Edn.,* 94 Ohio St.3d 197, 201 (2002), quoting 3 Restatement of the Law 2d, Contracts 154, § 355 (1981) ("'the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach . . . .'"); *Schulke Radio Prods., Ltd. v. Midwestern Broadcasting Co.,* 6 Ohio St.3d 436, 439 (1983) ("Money damages awarded in a breach of contract action are designed to place the aggrieved party in the same position it would have been in had the contract not been violated.").

{¶ 66} Judgment affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion.

It is ordered that the parties share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LISA B. FORBES, PRESIDING JUDGE

MARY J. BOYLE, J., CONCURS;
EMANUELLA D. GROVES, J., DISSENTS IN PART AND CONCURS IN JUDGMENT ONLY IN PART (WITH SEPARATE OPINION)

EMANUELLA D. GROVES, J., DISSENTING IN PART AND CONCURRING IN JUDGMENT ONLY IN PART:

{¶ 67} I write separately to dissent with the majority's finding that there was insufficient evidence presented to establish a violation of the CSPA. Additionally, I would address the manifest-weight challenge with respect to the CSPA and find that Danyette Caldwell's ("Ms. Caldwell") CSPA claim was supported by the weight of the evidence and that she was entitled to the award of damages and attorney fees as ordered by the trial court. I believe that the CSPA was created exactly for this type of case, to protect consumers like Ms. Caldwell from deceptive conduct like Acorn's. In regard to the remaining findings, I concur in judgment only.

{¶ 68} Sufficiency is

> """a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' In essence, sufficiency is a test of adequacy.""

*Eastley*, 2012-Ohio-2179, at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 69} A court of appeals should affirm a trial court's decision when the evidence is legally sufficient to support the verdict as a matter of law. *In re Z.C.*, 2023-Ohio-4703, ¶ 13, citing *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3.

{¶ 70} Here, I would affirm the trial court's finding that Ms. Caldwell met her burden of production to establish a claim under the CSPA. Violations of the CSPA are not limited to the Revised Code.

> The General Assembly has delegated authority to the attorney general to "[a]dopt, amend, and repeal substantive rules defining with reasonable specificity acts or practices that violate sections 1345.02 [and] 1345.03 . . . of the Revised Code."

(Brackets in original.) *Williams v. Spitzer Autoworld Canton, L.L.C.*, 2009-Ohio-3554, ¶ 11, quoting R.C. 1345.05(B)(2).

{¶ 71} The trial court's journal entry is 13 pages long, presents detailed findings of facts and conclusions of law, and comprehensively sets out the reasons for its decision. The trial court found that appellants violated Adm.Code 109:4-3-03(B); 109:4-3-05(A) and (D)(12); 109:4-3-07(B)-(C); 109:4-3-09; and 109-4-3-10(A), each of which defines the conduct described therein as a deceptive and unfair act or practice. Based on my review of the record, there was sufficient evidence to support the trial court's findings of a CSPA violation.

## Bait and Switch Adm.Code 109:4-3-03(B)

{¶ 72} Under Adm.Code 109:4-3-03(B) it is a deceptive and unfair practice

for a supplier to make an offer of sale of any goods or services when such offer is not a bona fide effort to sell such goods or services. An offer is not bona fide if:

(3) A supplier discourages the purchase or sale of the offered goods or services by any means, including but not limited to the following:

(c) The showing or demonstrating of offered goods or services which are unusable or impractical for the purposes represented, or materially different from the offered goods or services.

{¶ 73} Ms. Caldwell testified that the contract she signed with Allen specified that he would install Lennox furnaces. Tr. 22-23; Plaintiff's exhibit No. 3. Allen delivered two furnaces that were not Lennox brand; additionally, the units were not suitable for her home. Tr. 21, 23.

**Failure to Deliver Adm.Code 109:4-3-09**

{¶ 74} This section finds it is a deceptive act or practice in a consumer transaction for a supplier:

(2) To accept money from a consumer for goods or services ordered by mail, telephone, the internet, or otherwise and then permit eight weeks to elapse without:

(a) Making shipment or delivery of the goods or services ordered;

(b) Making a full refund;

(c) Advising the consumer of the duration of an extended delay and offering to send the consumer a refund within two weeks if the consumer so requests; or

(d) Furnishing similar goods or services of equal or greater value as a good faith substitute if the consumer agrees.

Adm.Code 109:4-3-09(A)(2).

{¶ 75} Ms. Caldwell paid the deposit of $4,500, never received those goods, and never received a full refund of the deposit. Additionally, Acorn did not provide similar goods of equal or greater value. Tr. 21-23; 78-79, 80.

{¶ 76} Accordingly, based on the foregoing, I would overrule Acorn's challenge to the sufficiency of the CSPA claims.

{¶ 77} The majority as a result of its findings did not reach the merits of Ms. Caldwell's manifest-weight challenge. I would address it and find that the CSPA violation was supported by the weight of the evidence. The trial court, who was in a much better position to observe the demeanor and conduct of the witnesses, described Lawrence as follows:

> This Court also notes that Lawrence's testimony in regard to the HVAC project and his relationship with Charles Allen was generally not credible, for multiple reasons. First, Mr. Lawrence has repeatedly contradicted his prior sworn testimony and interrogatory responses in regard to material issues and has done so on multiple occasions without reasonable explanation. Second, Mr. Lawrence's explanation of events did not make sense and have not remained consistent throughout this litigation. Third, Mr. Lawrence testified to shredding, destroying, or otherwise failing to produce copies of multiple critical documents. (Tr. 86:8-87:1; 97:14-22). Fourth, Mr. Lawrence's testimony was contradicted by testimony from a witness this Court found to be more credible, Samantha Vajskop, on the key issue of Mr. Lawrence's knowledge and dealings with former Defendant Charles Allen. Samantha Vajskop was found to be a credible witness. Ms. Caldwell was also found to be credible witness.

Trial court's journal entry p. 2-3.

{¶ 78} I find Acorn's business practices very telling. From my viewpoint, though the majority does not agree, and only sees a simple breach-of-contract action, Acorn's business is set up to allow them to avoid liability and responsibility

while accepting customers' money. The record reflects that in a parallel transaction with Ms. Caldwell for the plumbing at her residence, Lawrence enlisted the help of Womack to spearhead the transaction, create the contract, but did not reveal himself as an agent of Acorn until he needed to pull a permit for the job. Acorn acknowledges that they were affiliated with this transaction simply because it was successfully completed. However, Allen behaved in exactly the same manner as Womack when conducting business with Ms. Caldwell, in that he secured the contract, and accepted the deposit. However, Acorn was not mentioned until the permit was pulled. When Ms. Caldwell called Acorn, they did not deny knowledge of the transaction or Allen, but acted as if they would address her concerns. It was only after Ms. Caldwell sued that Acorn disavowed any knowledge of Allen or the HVAC work it contracted to do for Ms. Caldwell. And yet, Lawrence admitted pulling the permit which required him to describe the scope of work and claimed that he routinely paid $101 to pull a permit even for jobs he had not acquired. In my view, the facts of this case illustrate Acorn's and Lawrence's intention to shield themselves from liability and responsibility. Acorn's conduct was exactly the kind of deceptive and unfair conduct that the CSPA was designed to discourage.

{¶ 79} Accordingly, I would overrule the appellants' assignment of error as to the sufficiency of the evidence on the CSPA claim and the weight of the evidence. Furthermore, I would uphold the trial court's findings on damages and attorney fees.