[Cite as *Caldwell v. Custom Craft Builders, Inc.*, 2026-Ohio-115.]

# Court of Appeals of Ohio, Eighth District

## County of Cuyahoga
## Nailah K. Byrd, Clerk of Courts

DANYETTE CALDWELL,

                    Appellee                 COA NO.
113209

       -vs-                        COMMON PLEAS COURT

CUSTOM CRAFT BUILDERS, INC., ET AL.

                    Appellants            MOTION NO. 583050

Date: January 15, 2026

_____
Journal Entry
_____

Combined application by appellee for reconsideration is granted. The journal entry and decision released March 13, 2025, 2025-Ohio-828, is hereby vacated and substituted with the journal entry and opinion issued this same date. En banc consideration remains pending.

Judge Emanuella D. Groves, Concurs
_____

Judge Mary J. Boyle, Concurs

                                       _____
                                       Lisa B. Forbes
                                       Presiding Judge

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

DANYETTE CALDWELL,        :

    Plaintiff-Appellee,      :

                               No. 113209

    v.                       :

CUSTOM CRAFT BUILDERS, INC.,   :
ET AL.,

    Defendants-Appellants.    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
                    AND REMANDED
**RELEASED AND JOURNALIZED:** January 15, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-887398

---

### *Appearances:*

Myers Law, LLC and Daniel J. Myers, *for appellee*.

Mike Heller Law Firm and Michael A. Heller, *for appellants*.

ON RECONSIDERATION[1]

LISA B. FORBES, P.J.:

{¶ 1} Pursuant to App.R. 26(A)(1)(a), appellee Danyette Caldwell ("Caldwell") filed an application for reconsideration of this court's opinion in *Caldwell v. Custom Craft Builders, Inc.*, 2025-Ohio-828 (8th Dist.).

{¶ 2} The general test regarding whether to grant a motion for reconsideration under App.R. 26(A)(1)(a) "is whether the motion for reconsideration calls to the attention of the court an obvious error in its decision or raises an issue for our consideration that was either not considered at all or was not fully considered by us when it should have been." *State v. Marriott*, 2021-Ohio-2845, ¶ 2 (8th Dist.), quoting *Matthews v. Matthews*, 5 Ohio App.3d 140, 143 (10th Dist. 1982).

{¶ 3} Caldwell's motion calls to the attention of this court an error of law in its decision. Accordingly, we grant the motion for reconsideration, vacate the earlier opinion, and issue this opinion in its place. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

{¶ 4} Acorn Plumbing & Heating, L.L.C. ("Acorn") and Oscar Lawrence, Jr. ("Lawrence") (collectively "Defendants") appeal from the trial court's journal entry, after a bench trial, finding in favor of Caldwell on her claims for breach of contract,

---

[1] The original decision in this appeal, *Caldwell v. Custom Craft Builders*, 2025-Ohio-828 (8th Dist.), released on March 13, 2025, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. *See* App.R. 22(C); *see also* S.Ct.Prac.R. 7.01.

conspiracy to commit fraud, and violations of the Consumer Sales Practices Act ("CSPA"). After reviewing the facts of the case and pertinent law, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## I. Facts and Procedural History

{¶ 5} On August 12, 2016, Caldwell, who is the owner of the house located at 20321 Lindbergh Ave. in Euclid (the "Property"), entered into a contract with Charles Allen ("Allen") to install two new Lennox furnaces at the Property (the "Contract"). According to the Contract, the total cost for labor, materials, and permits was $9,500. The Contract further states that "[f]irst payment due $4,500 after permit is pulled."

{¶ 6} On August 10, 2016, Acorn, which is a heating, ventilation, and air conditioning ("HVAC") company owned and operated by Lawrence, pulled a permit to "replace 2 furnaces" at the Property (the "Permit"). Allen gave Caldwell a copy of the Permit when the Contract was signed, and Caldwell wrote a check for $4,500 made payable directly to Allen. Allen, who is now deceased, told Caldwell that he worked for Acorn. Ultimately, the Lennox furnaces were never delivered, and Caldwell hired two other companies to perform the HVAC work.

{¶ 7} On October 13, 2017, Caldwell filed a complaint against the Defendants and other entities, including Allen. Against Acorn, Lawrence, and Allen, Caldwell's complaint alleged breach of contract, conspiracy to commit fraud, and violations of the CSPA. The Defendants' answer alleged that they never contracted with Caldwell to replace furnaces at the Property. There were issues with service of

the complaint and discovery disputes, which the trial court attempted to resolve. In March 2019, the case proceeded to a bench trial, and in December 2019, the court found in favor of Caldwell on all three of her claims, entering a $50,654 judgment against the Defendants jointly and severally. In November 2020, the court held a hearing regarding attorney fees and awarded Caldwell $20,627.50 in attorney fees.

{¶ 8} The Defendants appealed the judgments, and this court found that the trial court abused its discretion by denying the Defendants' motion to withdraw or amend their admissions during the parties' discovery disputes. *Caldwell v. Custom Craft Builders, Inc.*, 2021-Ohio-4173 (8th Dist.) ("*Caldwell I*"). *Caldwell I* vacated the trial court's judgments and remanded the case to the trial court for further proceedings. For a detailed review of the procedural and factual history up to the 2019 bench trial, see *Caldwell I*.

{¶ 9} In this opinion, we pick up where *Caldwell I* left off, because the discovery issues that were dispositive in *Caldwell I* are not at issue here. As *Caldwell I* noted in part, and as apropos to the instant appeal, "it is clear that the key issue is whether a relationship existed between Allen and [the Defendants] such that [the Defendants] can be held liable for the . . . written contract executed by Allen and Caldwell." *Caldwell I* at ¶ 47.

{¶ 10} On January 24, 2023, a second bench trial was held in this case. On May 26, 2023, the court issued a journal entry finding in favor of Caldwell on all three of her claims against the Defendants, jointly and severally, and awarded judgment in the amount of $58,804 plus interest. Additionally, on August 31, 2023,

the court awarded attorney fees in favor of Caldwell and against the Defendants in the amount of $27,117.90. It is from these orders that the Defendants appeal raising ten assignments of error for our review.

> I. The trial court erred and/or abused their discretion in finding in favor of Plaintiff on all her claims and against Defendants.
>
> II. The trial court erred in finding Defendants engaged in a civil conspiracy with Charles Allen.
>
> III. The trial court erred in finding Defendants engaged in fraud.
>
> IV. The trial court erred in admitting Plaintiff's contract with Charles Allen into evidence.
>
> V. The trial court erred in admitting Plaintiff's check to Charles Allen into evidence.
>
> VI. The trial court erred in finding Defendants violated the CSPA.
>
> VII. The trial court erred in awarding attorney's fees and costs to Plaintiff.
>
> VIII. The trial court erred in baldly rendering judgment against Defendants "jointly and severally[.]"
>
> IX. The trial court's holding was against the sufficiency of the evidence.
>
> X. The trial court's holding was against the manifest weight of the evidence.

{¶ 11} Because Caldwell's assignments of error are repetitive, we address them out of order and, at times, together.

## II. Trial Testimony

### A. Danyette Caldwell

{¶ 12} Caldwell testified that she purchased the Property on September 21, 2015, and she hired "Charles Allen and Acorn" to do HVAC work at the Property.

Asked if she believed Allen had "some affiliation with some company," Caldwell answered, "Yes." Asked the basis for this belief, Caldwell testified as follows: "Well, when . . . it was time for the down payment to be paid and [Allen] produced the permit, it had Acorn on there. I asked him, you know, why was the names different, and he said he worked for Acorn and that's how he gets his permits . . . ."

{¶ 13} Caldwell testified that the HVAC work she was going to have done was to have "[t]wo furnaces installed," and she made a $4,500 down payment via check to Allen for this work, and she expected to pay a total of $9,500. Caldwell further testified that she "ended up paying another company to install."

{¶ 14} When Caldwell paid the $4,500, she did not receive any written receipt. She did not receive anything in writing that said whether the $4,500 was refundable or not.

{¶ 15} Caldwell testified as follows about whether this "HVAC project" under the Contract worked out:

> Well, when [Allen] first came to the home with the furnaces and the duct work, like, the materials things, upon first notice, the furnaces were not the Lennox brand that we agreed upon. So things began there. We had a conversation about that. He said he would take them back, and . . . refund — he did say that they — a little bit later on said that they were — cost too much, but . . . .

{¶ 16} Caldwell explained that Lennox brand furnaces were "specifically called out . . . in the contract that we had." Caldwell further testified that she later found out that "the BTUs [of the furnaces that Allen attempted to deliver] were way too much for my home." Caldwell again testified that Allen said he was going to give

her a refund, but she never got the $4,500 back, and Allen never delivered the Lennox furnaces or any other furnaces.

{¶ 17} Asked what caused her to write the $4,500 down payment check to Allen, Caldwell explained: "The permit. Once he provided me with the permit is when I paid him the $4,500. There was a conversation. You know, I asked him why was the name difference. He just told me that he worked for Acorn, and that's when I went on and paid him the deposit."

{¶ 18} Caldwell filed a complaint with the Euclid building department and she filed a police report. She also called Acorn and spoke with someone named Sahara, who Caldwell believed to be Lawrence's daughter and "the contact person" at Acorn.

{¶ 19} Caldwell testified that she also had "rough-in plumbing" work done at the Property by Acorn and specifically by a person named "Ramar." Caldwell further testified that the permit for the plumbing work was pulled by Acorn on August 11, 2016, which is one day after the Permit for the HVAC work was pulled by Acorn. Caldwell also testified that she paid for the plumbing work via a check written to "Ramar Womack" and that the contracts for the plumbing work were between her and Ramar, or more specifically, Ramar's company S&G Plumbing. According to Caldwell, Acorn was not referenced on these plumbing contracts. Caldwell testified that "it was explained to" her that Ramar was "the contractor for Acorn . . . . [Acorn is] like the overhead, I guess, the overseer." Caldwell testified that she had no issues with the plumbing work.

{¶ 20} Asked what she said to Sahara when Caldwell contacted her, Caldwell testified as follows:

> A: I just explained that — basically that Charles Allen had not returned the money, he never did the work, never came back with the furnaces, and we needed a resolution on what to do next because my money is floating around out there. I still need — the work still needs to be done.
>
> Q: And did anyone at that time, anyone from Acorn, Sahara, anyone else, state we don't — we don't know who Charles Allen is?
>
> A: No.
>
> Q: Did she deny any involvement by Acorn and the project?
>
> A: No.
>
> Q: Did you speak with her over the phone? How did you communicate with her?
>
> A: Oh, over the phone. She had me send her . . . the contract and things, and then that was basically it. She said she would get back with me.

{¶ 21} Asked why she contacted "Sahara as opposed to anyone else in the world," Caldwell testified that "the building department provided me with her number." According to Caldwell, Acorn never refunded her money and never did any HVAC work at the Property. Caldwell testified that neither Lawrence nor anyone else from Acorn contacted her after she spoke to Sahara. Caldwell testified that she canceled the Permit that Acorn pulled for HVAC work at the Property so that another company could pull a permit and she could get the furnaces installed. Caldwell testified that two companies, Air Serv and Smylie One, eventually "did the HVAC work," and she paid "[a]pproximately about $15,000" to "get the HVAC work finished." Caldwell presented a "quote" or "proposal" for $2,850 and another

document listing an amount of $12,318. Caldwell testified that she paid these amounts.

{¶ 22} Caldwell testified that Lawrence "said he didn't know Charles Allen and he — that wasn't his employee."

{¶ 23} On cross-examination, Caldwell testified that Allen was referred to her by J.D. Carpentry. Caldwell sent a text message to Allen on June 28, 2016, asking to "separate the estimates one for plumbing and one for heating and plumbing" for the Property. According to Caldwell, she had "back and forth" conversations with Allen "to get to the terms of the contract." At no time during these "negotiations" was Acorn mentioned. Caldwell testified that she first heard the name "Acorn" when she saw the HVAC Permit. She confirmed that the Contract she signed with Allen included that the "Total Labor Costs" were $9,500, with $500 to pull the Permit, the first payment of $4,500 due after the Permit was pulled, and the second payment of $4,500 due after city inspection was completed. The HVAC Permit included an "estimated improvement value" of $3,000, which is not consistent with any of the numbers in the Contract.

{¶ 24} Caldwell identified a proposal provided by Allen dated July 5, 2016. That document provided an estimate of $9,500 to perform labor and provide materials for the furnace work at the Property. The estimate was signed by Charles Allen.

{¶ 25} Caldwell further testified that Ramar Womack was referred to her by her friend "Chris." According to Caldwell, her "negotiations" with Ramar were "in a similar period of time" as her negotiations with Allen.

{¶ 26} Caldwell testified that, during her negotiations with Ramar, Ramar mentioned the name "Acorn Heating & Cooling . . . [o]nce the permit was pulled."

{¶ 27} Caldwell testified that when she spoke with Sahara, which was only once, Sahara did not say that Allen was an employee or an agent of Acorn. Caldwell further testified that there is no mention of Acorn or Lawrence in the Contract she signed with Allen. Caldwell also testified that there is no mention of Acorn or Lawrence on the $4,500 check she wrote to Allen for the down payment on the HVAC work.

{¶ 28} According to Caldwell, although she negotiated with Allen and Ramar regarding work at the Property "right about the same time," she never saw Allen and Ramar together or at the same time, and to her knowledge, neither Ramar nor Allen knew that the other was also doing work, or had contracted to do work, at the Property.

## B. Oscar Lawrence (as if on cross-examination)

{¶ 29} Caldwell's attorney called Lawrence to testify as if on cross-examination during Caldwell's case-in-chief. Lawrence testified that he is the owner of Acorn, which is in the HVAC business. According to Lawrence, he does not know who Allen is and Allen had never worked for Acorn or Lawrence. Asked if he told "the other attorneys" at a case-management conference "a different story,"

Lawrence answered, "That isn't true." Lawrence agreed that Acorn "did plumbing work" at the Property "at about the same time" that Caldwell contracted with Allen to do the HVAC work. Lawrence testified that Acorn pulled a permit for the plumbing job and Acorn pulled a permit for the HVAC job at the Property.

{¶ 30} According to Lawrence, Ramar "got that [plumbing] job for Acorn" and Caldwell paid Ramar directly. Asked if Ramar "was supposed to pay Acorn" for that job, Lawrence answered, "Yes." This colloquy continued:

> Q: So Ramar, your employee, signs up jobs using his company's name, but they're actually Acorn jobs?
>
> A: Yes.
>
> Q: And there's no mention of Acorn anywhere in that agreement, right?
>
> A: No.
>
> Q: And the only — the only thing in writing that we see that mentions Acorn for either the heating or the plumbing job, that's the permits, right?
>
> A: Yes.
>
> . . .
>
> Q: . . . In your opinion, was there ever a contract for the heating portion of the job . . . between [Caldwell] and Acorn?
>
> A: No.
>
> . . .
>
> Q: Despite the fact that there was no contract, you still pulled a permit for that work?
>
> A: Yes.
>
> Q: And you paid for that permit some money, didn't you?

A: Yes.

Q: Looks like . . . it says the permit fee was $101. Does that sound accurate?

A: Yes.

Q: Do you make a habit of paying $100 on jobs that you don't actually have yet?

A: Yes.

. . .

Q: Okay. So there's not necessarily some Acorn contract that you use with all of your customers, right?

A: Not necessarily.

. . .

Q: And so you would agree also that your employees, you allowed your employees to make the contract between them and their — them and the customer, right?

A: Sometimes.

. . .

Q: Well, you allowed Ramar to do that with Ms. Caldwell, right?

A: Yes.

Q: And you did the same thing when it came to Charles Allen and the heating contract, didn't you?

A: No, sir. I never knew Charles Allen.

{¶ 31} Lawrence testified that Sahara is his daughter, and she is authorized to receive phone calls on behalf of Acorn. Lawrence testified that he became aware of the situation at issue in this case when he "received some legal papers that notified [him] that [he] had to come to court."

{¶ 32} Lawrence testified that he "verbally" cancelled the Permit for the HVAC work at the Property, although he did not remember the date this was done. Asked why he cancelled the Permit if he was not aware of the situation until Caldwell filed this lawsuit, Lawrence explained as follows: "I knew to cancel it because I heard somewhere, some way, that [Caldwell] had given the contract to Charles Allen. I said I'm going to cancel my permit because I don't have anything to do with Charles Allen because I don't know him, he doesn't work for me." This line of testimony continued:

> Q: In order to apply for the heating permit, you had to know the scope of work, right?
>
> A: Yes.
>
> Q: Okay. And in order to apply for the plumbing permit, you had to know the scope of work, right?
>
> A: Yes.
>
> Q: And somehow you know the scopes of those works before the contracts were even signed by [Caldwell], right?
>
> A: Yes.
>
> Q: Would it be accurate to say that you understood that if you were to pull the heating permit for the job that you were going to get the heating project?
>
> A: Yes.
>
> Q: And so you pulled the heating permit?
>
> A: Yes.
>
> Q: It was your understanding that that was actually a condition of you getting the heating job . . . ?
>
> A: Yes.

Q: And you fulfilled that condition?

A: Yes.

Q: So in your mind at that time, you — at the time you did the permit, you had the heating job, right?

A: Yes.

Q: So if Charles Allen wasn't your employee, when exactly were you planning on getting someone out there to talk to [Caldwell] and sign her up?

A: When — when I heard that someone else was doing the work on the . . . HVAC, but for [Caldwell], I just canceled my permit because I had — I had no right to be there.

. . .

Q: So you pull a permit for this job on August 10th, believing you got the job, and then you never sent an employee out, you never get a contract signed, you never ask for payment, and . . . . You never sent an employee out to talk to [Caldwell] then, is that what you're saying?

A: I had to wait until [Caldwell] invited me in to make an estimate cost or a true estimate cost of the job and we agreed on the contract, and that never happened.

## C. Samantha Vajskop

{¶ 33} Samantha Vajskop ("Vajskop") testified that she is an attorney and she used to work for the firm who represented Caldwell at trial in the case at hand. In January 2018, Vajskop attended a case-management conference in relation to this case. Lawrence, who was representing himself pro se at the time, also attended this case-management conference. Service of the complaint had not been perfected on Allen, and Vajskop asked Lawrence if he knew where Allen was. Lawrence confirmed that he knew Allen and that Allen "had worked for" Lawrence, but Lawrence did not know where Allen was at that time. According to Vajskop,

Lawrence "actually confirmed that [Allen] did work for [the Defendants], because that was the question that I had." Asked if Lawrence indicated that Allen worked for Lawrence or Acorn "with regards to the job of Caldwell," Vajskop answered, "I don't believe that came up at the case management conference." Vajskop also testified about an affidavit that she prepared in relation to issues concerning service of the complaint. This affidavit states in part as follows: "Mr. Lawrence confirmed to us that he knew Defendant Allen. Mr. Lawrence also told us that Defendant Allen used to work for him as an employee, but that Defendant Allen did not work for him anymore."

### D. Oscar Lawrence on Direct Examination

{¶ 34} Lawrence testified on behalf of the Defendants in their case-in-chief that Acorn "did a plumbing job" for Caldwell. Ramar "found the job" and performed the work. According to Lawrence, Ramar needed Acorn to get the permit and supervise the job. In exchange, Ramar paid Acorn although Lawrence testified that he "forgot" how much Acorn was paid. Lawrence testified that when he pulled the permit with the building department of Euclid, he had to provide "the address of the house, the owner, and what you're doing, whether new work, repair work, replacement."

{¶ 35} Lawrence testified that Ramar "came to" him regarding the plumbing work at the Property, and this is the "usual way" that Acorn gets work. Lawrence has "been in business a long time. They call me all the time." Lawrence testified that he typically gets permits and supervises jobs. "I have a number of people. In

this case, it was Ramar, but I don't have any full-time employees.  I may use a person for one week, two weeks, or a month and that's it, until I get some other work."

{¶ 36} Lawrence testified that he pulled a permit for an HVAC job at the Property although he did not have the job yet.  Asked why he pulled the Permit, Lawrence testified that a "man named Nijore contacted me."  Lawrence got "information about the job" and pulled the Permit.  Lawrence testified that he "was told that [he] would get the job" if he pulled the Permit.  According to Lawrence, all he knew this person by was the name "Nijore."  This testimony continued as follows:

Q:  Whoever that person was that caused you to have the understanding about the heating portion of the job, you said their name was Nijore?

A:  Yes.

Q:  Okay.  You don't know if that's a nickname or a legal name, right?

A:  No.

Q:  And you said you never met Charles Allen?

A:  Yes, I never met him.

Q:  So for all you know, Nijore could be Charles Allen?

A:  Could be.  I know the man as Nijore.

Q:  And you've known Nijore for 20 years?

A:  Yes.

. . .

Q:  So did you believe then that you pulled the permit that job is an Acorn job, Nijore was going to do it?

A:  No, I was going to do it.

Q:  You personally?

A: I have men I supervise to do the work.

Q: Men like Ramar?

A: Yeah, like Ramar.

. . .

Q: How do we make sure people are qualified when licensed contractors let people that aren't licensed work under their permit?

A: The licensed contractor is responsible for the job.

Q: Are you going to take responsibility for the heating project at [Caldwell's] house?

A: I was going to. But when she gave the job to someone else, I canceled my permit.

{¶ 37} Lawrence again testified that he did not know Allen, he did not get the HVAC job at the Caldwell Property, and he did not receive any payment regarding the HVAC job at the Caldwell Property.

## III. Law and Analysis

### A. Admissibility of Evidence

{¶ 38} In the Defendants' fourth assignment of error, they argue that the trial court "erred in admitting [Caldwell's] contract with . . . Allen into evidence." In the Defendants' fifth assignment of error, they argue that the trial court "erred in admitting [Caldwell's] check to . . . Allen into evidence."

{¶ 39} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). Pursuant to Evid.R. 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." Relevant evidence is not admissible, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the [factfinder]." Evid.R. 403(A)

{¶ 40} An abuse of discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). The Ohio Supreme Court explained that an abuse of discretion "involves more than a difference of opinion." *State v. Weaver*, 2022-Ohio-4371, ¶ 24. That is, a trial court's judgment that is "profoundly and wholly violative of fact and reason" constitutes an abuse of discretion. *Id.*

{¶ 41} The Defendants argue that because they were not a party to the Contract or the $4,500 check that Caldwell wrote to Allen and because they were unable to cross-examine Allen, these two documents "should have been excluded" from trial. The Defendants summarily conclude that these documents are irrelevant, and in the alternative, they "improperly prejudiced" the Defendants pursuant to Evid.R. 403(A). Indeed, Evid.R. 403(A) is the only law the Defendants cite under these two assignments of error.

{¶ 42} The Defendants' arguments are not well-taken. Caldwell alleged that the Defendants breached the Contract and that her damages included the $4,500 down payment she made that was never returned to her. The Contract and down payment are, thus, relevant to this claim. Furthermore, we cannot say that the

danger of unfair prejudice outweighed the probative value of admitting at trial the Contract and method of payment that are the subject of a breach-of-contract claim. *See* Evid.R. 1002 ("To prove the content of a writing . . . the original writing . . . is required."); *Castle Hill Holdings, L.L.C., v. Al Hut, Inc.*, 2006-Ohio-1353, ¶ 30 (8th Dist.) ("[T]o prove the contents of a writing, the 'best evidence rule' requires that the actual document, or an exact duplicate thereof, be introduced.").

{¶ 43} Accordingly, the Defendants' fourth and fifth assignments of error are overruled.

## B. Sufficiency of the Evidence

{¶ 44} With assignments of error Nos. 1, 2, 3, 6, 7, 8, and 9, Defendants assert that the evidence at trial was not sufficient to support the claims raised by Caldwell. In their first assignment of error, the Defendants challenge the trial court's "finding in favor of Plaintiff on all her claims," arguing that the evidence was insufficient as relates to breach of contract and conspiracy to commit fraud. Assignment of error No. 2 asserts that trial court erred in finding Defendants engaged in civil conspiracy, arguing the evidence was not sufficient to support the claim. With their third assignment of error, Defendants assert the trial court erred in finding defendant engaged in fraud, arguing Appellee "fails to show a connective link" between Defendants and Allen. Without using the words "sufficiency of the evidence," Defendants seek judgment as a matter of law. Consequently, we will consider assignment of error No. 3 to raise a challenge to the sufficiency of the evidence. Defendants' sixth assignment of error challenges the trial court's finding

that Defendants violated the CSPA, arguing that the evidence did not support each element of a CSPA claim. The Defendants' seventh assignment of error challenges the sufficiency of the evidence to support the award of attorney fees. The Defendants' eighth assignment of error challenges the sufficiency of the evidence concerning Lawrence's personal liability. The Defendants' ninth assignment of error challenges the sufficiency of the evidence presented at trial.

{¶ 45} "When reviewing the sufficiency of the evidence in civil cases, the question is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent, credible evidence." *Mtge. Electronic Registration Sys. v. Mosley*, 2010-Ohio-2886, ¶ 28 (8th Dist.) "Put more simply, the standard is 'whether the verdict [is] one which could be reasonably reached from the evidence.'" (Bracketed text in original.) *Id.*, quoting *Ruffo v. Shaddix*, 1999 Ohio App. LEXIS 2608, *6 (8th Dist. June 10, 1999). "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence . . . evidence must still exist on each element" of each claim. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. "'"Whether the evidence is legally sufficient to sustain a verdict is a question of law."'" *Id.* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 46} For ease of analysis, first we review the challenge to the sufficiency of the evidence against Lawrence personally. We then consider the sufficiency of the evidence as to each of Caldwell's substantive claims against Acorn for breach of contract, violations of the CSPA, and civil conspiracy to commit fraud. Finally, we

address the challenge to the sufficiency of the evidence presented in support of Caldwell's claim for attorney fees.

### 1. Personal Liability of Lawrence

{¶ 47} In the Defendants' eighth assignment of error, they argue that the trial court erred by "baldly rendering judgment against Defendants 'jointly and severally.'" Specifically, the Defendants argue that the court erred by holding Lawrence personally liable for Acorn's conduct.

{¶ 48} Regarding liability under the CSPA, a company owner or officer is individually liable for any violation of the CSPA that he personally committed or in which he personally took part, specifically directed, or cooperated. *Garber v. STS Concrete Co., L.L.C.*, 2013-Ohio-2700, ¶ 27-28 (8th Dist.); *Burns v. Spitzer Mgmt.*, 2010-Ohio-5369, ¶ 32 (8th Dist.); *Grayson v. Cadillac Builders, Inc.*, 1995 Ohio App. LEXIS, *8-9, fn. 1 (8th Dist. Sept. 14, 1995). Otherwise, an individual is generally immune for the wrongful acts of a corporate entity. *See Belvedere Condominium Unit Owners' Assn. v. Roark Cos. Inc.*, 67 Ohio St.3d 274, 287 (1993). An exception to this rule is found in the "alter ego doctrine" and the concept of "piercing the corporate veil." *Id.* The *Belvedere* Court set forth this test as follows:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at 289. Ohio courts have applied *Belvedere's* test concerning piercing the corporate veil to limited-liability companies like Acorn. *See United States Bank Natl. Assn. v. MMCO, L.L.C.*, 2021-Ohio-4605 (8th Dist.) (applying *Belvedere's* pierce-the-corporate-veil test to a limited-liability company); *Best Fin. Sols., L.L.C. v. Tifton Custom Packing, L.L.C.*, 2024-Ohio-4458 (1st Dist.) (applying *Belvedere's* pierce-the-corporate-veil test to a limited-liability company).

{¶ 49} Upon review, we find that there is no evidence that Lawrence personally committed, directed, participated in, or cooperated in any act that violated the CSPA as "unfair or deceptive." *See Tsirikos-Karapanos v. Ford Motor Co.*, 2017-Ohio-8487, ¶ 36 (8th Dist.), quoting *Warren v. Denes Concrete, Inc.*, 2009-Ohio-2784, ¶ 23 (9th Dist.) ("'A CSPA claim will not be successful unless the [defendant's] performance amounted to a deceptive, unfair, or unconscionable act.'"). Unfair or deceptive acts are "those that mislead consumers about the nature of the product they are receiving . . . ." *Id.* Lawrence testified that he pulled the HVAC Permit on behalf of Acorn. The record includes no evidence that, when he did so, he knew that Allen would not install the furnaces that the Contract required.

{¶ 50} Further, we find no evidence in the record sufficient to justify piercing the corporate veil. The record contains no evidence as to how complete or incomplete Lawrence's control of Acorn was; there is no evidence in the record that Lawrence's control over Acorn was exercised in a manner to commit fraud or an illegal act; and, there is no evidence in the record that Lawrence's control over Acorn resulted in an injury to Caldwell. Lawrence testified that he is the owner of Acorn

and he is the "head person in charge." However, the Ohio Supreme Court has held that "[p]iercing the corporate veil . . . remains a 'rare exception,' to be applied only 'in the case of fraud or certain other exceptional circumstances.'" *Dombroski v. WellPoint, Inc.*, 2008-Ohio-4827, ¶ 17, quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Lawrence's testimony that he owns and is in charge of Acorn is insufficient to pierce the corporate veil. *See, e.g., Ohio City Orthopedics, Inc. v. Med. Billing & Receivables, Inc.,* 2003-Ohio-1881, ¶ 16 (8th Dist.) ("Appellant set forth no evidence demonstrating that [the person] was so intertwined with [the corporation] so as to make it her alter ego. [T]he mere fact that [the person] is the sole shareholder and officer of the corporation is not sufficient evidence to demonstrate that . . . the corporate veil should be pierced. Something more must be shown.").

{¶ 51} Accordingly, we find that the trial court erred by granting judgment against the Defendants jointly and severally, specifically by granting judgment against Lawrence personally. The Defendants' eighth assignment of error is sustained.

### 2. Liability of Acorn

#### a. Breach of Contract

{¶ 52} We next turn to the Defendants' first and ninth assignments of error regarding the trial court's findings in favor of Caldwell on her breach-of-contract claim under a sufficiency-of-the-evidence standard of review. To succeed on a breach-of-contract claim, a plaintiff must prove, by a preponderance of the evidence,

that a contract existed; the plaintiff performed; the defendant failed to perform its contractual obligations; and the plaintiff suffered damages as a result of the breach. *Carbone v. Nueva Constr. Group*, 2017-Ohio-382, ¶ 14 (8th Dist.).

{¶ 53} In the case at hand, it is undisputed that Caldwell and Allen entered into the Contract at issue. Acorn, via Lawrence or any other representative, did not sign the Contract and did not expressly agree with Caldwell to do HVAC work at Caldwell's house.

{¶ 54} To bind a party under the doctrine of apparent agency, the evidence must show:

> (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.

(Cleaned up.) *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 576 (1991). When applying this test for apparent agency, the "acts of the principal not the agent, create apparent authority." *Caston v. The Woodlands of Shaker Hts.*, 2024-Ohio-2267, ¶ 17 (8th Dist.). A "'principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority and not where the agent's own conduct has created the apparent authority.'" (Citation omitted.) *Logsdon v. Main-Nottingham Invest. Co.,* 103 Ohio App. 233, 242 (2d Dist. 1956).

{¶ 55} In the instant case, Caldwell presented evidence that, on the day before Caldwell and Allen entered into the Contract, Acorn pulled an HVAC permit for the Property. Caldwell testified that Allen showed her the Acorn Permit when she and Allen signed the Contract. Allen informed her that he worked for Acorn. "Once [Allen] provided me with the permit is when I paid him the $4,500."

{¶ 56} During Lawrence's testimony, he was asked, "In order to apply for the heating permit, you had to know the scope of the work, right?" Lawrence answered, "Yes." Lawrence was further asked if his understanding was that if Acorn pulled the Permit, Acorn would get the Caldwell HVAC job. Lawrence answered, "Yes." Lawrence was next asked, "So in your mind — at the time when you [pulled] the permit, you had the heating job, right?" Lawrence again answered, "Yes." The evidence in the record is undisputed that Allen had a copy of Acorn's HVAC Permit for the Property and that Allen gave a copy of this Permit to Caldwell as a condition to Caldwell making the initial $4,500 payment.

{¶ 57} Upon review of the trial testimony and exhibits, we find sufficient evidence that Acorn held Allen out, at least to Caldwell, as having the authority to act on behalf of Acorn. Thus, Caldwell had reason to believe that Allen possessed the authority to act on behalf of Acorn. Accordingly, a "preponderance of the evidence" was presented at trial that a contract, via the doctrine of apparent agency, existed between Caldwell and Acorn.

{¶ 58} It is undisputed that Caldwell paid Allen $4,500 under the Contract, Allen and Acorn failed to perform the HVAC work, and Caldwell suffered damages

as a result. Therefore, we find that the trial court's judgment relating to Caldwell's breach-of-contract claim against Acorn is supported by sufficient evidence in the record.

{¶ 59} The Defendants' first and ninth assignments of error are overruled in part as related to Caldwell's breach-of-contract claim against Acorn.

### b. CSPA

{¶ 60} The CSPA, which is codified in R.C. Ch. 1345, "prohibits suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03." *Johnson v. Microsoft Corp.,* 2005-Ohio-4985, ¶ 24. Relevant here are "unfair or deceptive" acts, and not "unconscionable acts or practices," because the trial court's journal entry finding in favor of Caldwell states that Acorn "engaged in . . . acts and practices, which this Court hereby declares as unfair or deceptive acts in violation of the CSPA . . . ."

{¶ 61} Unfair or deceptive acts are "those that mislead consumers about the nature of the product they are receiving . . . ." *Id.* A nonexhaustive list of "deceptive" acts is found in R.C. 1345.02(B)(1)-(10). "Although R.C. 1345.02 does not use the word 'falsity' or 'false,' each and every deceptive practice listed in . . . R.C. 1345.02 describes a misrepresentation of the truth, i.e., a falsity." *Grgat v. Giant Eagle, Inc.,* 2019-Ohio-4582, ¶ 15 (8th Dist.). Additionally, R.C. 1345.05(B)(2) authorizes the Ohio attorney general to adopt rules "defining with reasonable specificity acts" that violate the CSPA.

{¶ 62} Ohio courts have stated that the Ohio Administrative Code ("OAC"), which is the Ohio attorney general's "rules," "provides additional examples of acts or practices that may be considered deceptive under the CSPA." *Grgat* at ¶ 27. In its journal entry finding in favor of Caldwell, the trial court found that Acorn violated the following six administrative rules: OAC 109:4-3-07 (after Caldwell made the initial $4,500 payment, failure to provide a receipt, which included required language); OAC 109-4-3-05(A) (failure to provide Caldwell with a notice of a right to an estimate that included specified language); OAC 109:4-3-09 (failure to deliver goods within eight weeks of taking Caldwell's $4,500 deposit); OAC 109:4-3-03(B) (bait and switch by promising to deliver Lennox furnaces but providing a different brand); OAC 109:4-3-10(A) (falsely representing that it would perform the work by obtaining a building permit); and, OAC 109:4-3-05(D)(12) (failure to provide Caldwell a breakdown of the materials and labor costs for the project).

{¶ 63} Acorn argues that the evidence presented at trial was insufficient to demonstrate that Acorn engaged in any consumer transaction with Caldwell and that Caldwell's only contact was with Allen, who acted independently. Acorn's arguments about the sufficiency of the evidence as relates to the CSPA revolve around the assertion that there was no evidence of any relationship between Allen and Caldwell. We disagree.

{¶ 64} This court's decision in *Brown v. Deacon's Chrysler Plymouth, Inc.*, 1979 Ohio App. LEXIS 11171 (8th Dist. Nov. 15, 1979), is instructive in assessing Caldwell's CSPA claims against Acorn. In *Brown*, which concerned alleged CSPA

violations, this court noted that the "acts of an agent are considered the acts of the principal when such acts are within the scope of the agent's actual or apparent authority." *Id.* at *6. There, one of defendant's mechanics was accused of engaging in conduct in violation of the CSPA. The business entity argued there was no evidence it knew the mechanic had charged for but not installed certain auto parts. This court concluded, "to allow an employer to escape liability under the [CSPA] on the claim that it did not know of a specific violation committed by its employee would frustrate the Act itself." *Id.* at *7. *See also Frank v. WNB Grp., L.L.C.,* 2019-Ohio-1687, ¶ 32-33 (1st Dist.) (holding employer may be responsible for CSPA violation based on statements by an employee; reversing award of summary judgment in light of issue of material fact, noting that intent to deceive is "not a necessary element of a claimed violation of R.C. 1345.02").

{¶ 65} Here, the record contains sufficient evidence supporting the trial court's finding that Allen was an employee or agent of Acorn in connection with the Caldwell job. The Permit Allen showed to Caldwell before she paid the deposit and signed the Contract indicated that the Permit had been issued to Acorn for the purpose of replacing two furnaces at the Property. Caldwell testified that Allen described himself working for Acorn. The evidence demonstrated that Allen's and Ramar's methods of contracting with Caldwell, followed by Acorn securing building permits, were consistent. According to Lawrence, Ramar was an employee of Acorn. Vajskop explained that at a case-management conference in this case, Lawrence admitted Allen "had" worked for Acorn and "did" work for Acorn. We recognize that

Vajskop clarified that she did not ask Lawrence whether Allen worked for Acorn in connection with the Caldwell job. While we acknowledge that Lawrence testified he did not know Allen and that Allen was not an employee of Acorn, we also note that Lawrence testified that a man named "Nijore" caused Acorn to pull the HVAC Permit for the Property and that Lawrence conceded "Nijore" could have been Allen.

{¶ 66} Moreover, the evidence presented was sufficient to support finding the CSPA was violated. The trial court awarded actual economic damages on two CSPA violations — OAC 109:4-3-07 (failure to provide a receipt) and OAC 109:4-3-09(A)(2) (failure to deliver).[2]

{¶ 67} Under OAC 109:4-3-07(B),

[i]t shall be a deceptive act or practice in connection with a consumer transaction for a supplier to accept a deposit unless the following conditions are met: . . . (B) [a]t the time of the initial deposit the supplier must provide to the consumer a dated written receipt stating clearly and conspicuously the following information: (1) [d]escription of the goods and/or services to which the deposit applies, (including model, model year, when appropriate, make, and color); . . . (5) [w]hether the deposit is refundable and under what conditions . . . .

{¶ 68} Caldwell provided undisputed testimony that when she paid the $4,500 deposit, she did not receive any written receipt and did not receive anything in writing that stated whether the $4,500 was refundable or not.

---

[2] On the remaining four administrative-code violations, the trial court awarded an additional $200 each as statutory damages. We find that the form of the estimate provided, the bait and switch, and the failure to breakdown the cost of materials and labor were each supported by evidence in the record, in the form of Caldwell's testimony and the admission into evidence of the Contract and Permit, as discussed above. For the reasons set forth regarding assignments of error Nos. 3 and 9 regarding misrepresentation, we find insufficient evidence to establish a violation of OAC 109:4-3-10(A).

**{¶ 69}** Under OAC 109:4-3-09(A)(2),

[it] shall be a deceptive act or practice in connection with a consumer transaction for a supplier: . . . (2) [t]o accept money from a consumer for goods or services ordered by mail, telephone, the internet or otherwise and then permit eight weeks to elapse without: (a) Making shipment or delivery of the goods or services ordered; (b) Making a full refund; (c) Advising the consumer of the duration of an extended delay and offering to send the consumer a refund within two weeks if the consumer so requests; or (d) Furnishing similar goods or services of equal or greater value as a good faith substitute if the consumer agrees.

**{¶ 70}** Caldwell paid the deposit of $4,500 in August 2016, never received furnaces, and never received a full refund of her deposit. Once Caldwell specifically informed Acorn that Allen had not delivered or installed the proper furnaces as referenced on the Permit and Contract, Acorn did nothing. Acorn did not refund the $4,500, did not provide furnaces, and did not perform the work.

**{¶ 71}** Based on the evidence presented at trial, we find sufficient evidence to support the trial court's findings that Acorn violated the CSPA.[3] Accordingly, we overrule Defendants' assignments of error Nos. 1, 6, and 9 as relates to Caldwell's claim for violations of the CSPA.

### c. Conspiracy to Commit Fraud

**{¶ 72}** To succeed on a claim for conspiracy to commit fraud, a plaintiff must show that there is a "civil conspiracy" and that there is a "fraud." *See Morrow v. Reminger & Reminger Co., L.P.A.*, 2009-Ohio-2665, ¶ 40 (10th Dist.). "A civil

---

[3] However, as addressed in assignments of error Nos. 3 and 9 regarding Caldwell's claim for civil conspiracy to commit fraud, we find insufficient evidence to support the finding of a false representation. Consequently, we sustain Defendants' assignments of error Nos. 3 and 9 as relates to the violation of OAC 109:4-3-10 and reverse the trial court's award of statutory damages in the amount of $200.

conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Id.* A "civil conspiracy" is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *LeFort v. Century 21-Maitland Realty Co.*, 32 Ohio St.3d 121, 126 (1987). The elements of fraud are:

> (1) a representation of fact (or where there is a duty to disclose, concealment of a fact); (2) that is material to the transaction at issue; (3) made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the misrepresentation (or concealment); and (6) resulting injury proximately caused by the reliance.

*Malek v. Eresearch Tech., Inc.*, 2022-Ohio-3330, ¶ 24 (8th Dist.).[4]

{¶ 73} On appeal, Acorn argues that Caldwell failed to demonstrate a malicious combination in assignments of error Nos. 2 and 9. Further, in assignments of error Nos. 3 and 9, Acorn contends that nothing tied Acorn to Allen or demonstrated Acorn participated in any misrepresentation of fact to Caldwell. According to Acorn, Caldwell's confusion about who was going to install her furnace was caused by Allen and Allen alone.

{¶ 74} On appeal, Caldwell explains that her conspiracy claim is based upon the following: "Appellants and Charles Allen maliciously combined to injure

---

[4] Similarly, under OAC 109:4-3-10(A), "[i]t shall be a deceptive act or practice in connection with a consumer transaction for a supplier to: (A) [m]ake any representations, claims or assertions of fact . . . which would cause a reasonable consumer to believe such statements are true, unless at the time such representations, claims, or assertions are made, the supplier possesses or relies upon a reasonable basis in fact . . . ."

[Caldwell].'' "Generally, in the context of civil liability, where all defendants, allegedly coconspirators, are members of the same collective entity, corporate or municipal, there are not two separate 'people' to form a conspiracy.'" *Wiggins Invest., Inc. v. Waterstreet Mgmt., L.L.C.,* 2016-Ohio-4869, ¶ 22 (8th Dist.), quoting *Daudistel v. Silverton*, 2014-Ohio-5731, ¶ 45 (1st Dist.). In light of our finding that sufficient evidence supported the trial court's determination that Allen was an employee or agent of Acorn, we conclude that Caldwell did not demonstrate a conspiracy. Consequently, Caldwell's claim for civil conspiracy to commit fraud necessarily fails.

{¶ 75} Nonetheless, Caldwell maintains that the gravamen of her complaint is a claim for fraud, without regard to conspiracy. Caldwell argues on appeal that Defendants "falsely represented the fact that they were performing the furnace/HVAC work in their permit application, or that they were directly supervising the employee doing that work which caused a permit to be issued stating such."

{¶ 76} The trial court concluded that "Defendants made a false representation to [Caldwell], that they would be performing the work via their obtaining of the building permit, which would cause in the mind of a reasonable consumer a belief that they were performing the work." While the trial court concluded that "Defendants engaged in fraud," it did not award any compensatory damages as a result, stating, "Because the Court has already awarded compensatory damages, punitive damages are hereby awarded of two-times the deposit amount,

for a total of $9,000." The trial court also awarded $200 in statutory damages for misrepresentation under OAC 109:4-3-10(A).

{¶ 77} We find the trial court's finding of fraud committed by Acorn is not supported by the evidence at trial. Regarding the HVAC/furnace work, Lawrence explained that when he pulled the Permit for that job as an Acorn job, "I was going to do it . . . I have men I supervise do the work." Lawrence described himself as a licensed contractor and that "[t]he licensed contractor is responsible for the job." Further, he stated that he was going to take responsibility for the heating job at the Property, "[b]ut when she gave the job to someone else, I canceled my permit." Caldwell testified that she cancelled the Permit so that she could move forward with another contractor to perform the work.

{¶ 78} No evidence in this record supports the trial court's conclusion that, at the time Lawrence pulled Acorn's Permit for Caldwell's job, Acorn did not intend to supervise and/or perform the work for Caldwell. To the extent that pulling a permit amounted to a representation of fact that Acorn would do the work, there is no evidence in this record to support the conclusion that Acorn had no intention of completing the work when it pulled the Permit. *See Malek*, 2022-Ohio-3330, ¶ 24 (8th Dist.) (A finding of fraud requires a material misrepresentation of fact "made falsely, with knowledge of its falsity or with utter disregard and recklessness as to whether it is true or false."). To the extent the relationship between Acorn and Ramar is indicative of Acorn's business practices, it is notable that Caldwell was satisfied with the work performed by Ramar under the permit pulled by Acorn.

{¶ 79} Finally, both parties argue extensively about the relationship between Allen and Acorn and whether it binds Acorn to material misrepresentations of fact made by Allen. However, the record is devoid of any evidence regarding what Allen knew at the time he was communicating with Caldwell regarding the furnace work. There is simply no evidence regarding whether Allen intended to mislead Caldwell about providing Lennox furnaces or otherwise performing under the Contract with Caldwell at the time he made representations to Caldwell. We note that Allen died prior to the first trial of this dispute. His date of death was not established.

{¶ 80} Accordingly, we sustain Defendants' second, third, and ninth assignments of error with regard to Caldwell's claim for conspiracy to commit fraud. Consequently, we vacate the $200 statutory-damages award for the violation of OAC 109:4-3-10(A) and the $9,000 award of punitive damages in connection with the finding of fraud.

### d. Attorney Fees

{¶ 81} In their seventh assignment of error, Defendants challenge the trial court's decision granting Caldwell's motion for attorney fees pursuant to R.C. 1345.09(F)(2). Under R.C. 1345.09(F)(2), a trial court may award reasonable attorney fees to a prevailing plaintiff where "[t]he supplier has knowingly committed an act or practice that violates [the CSPA]." The term "knowingly" means that "the 'supplier need only intentionally do the act that violates the Consumer Sales Practices Act. The supplier does not have to know that his conduct violates the law.'"

*Parks v. Aburahma*, 2022-Ohio-4253, ¶ 15 (11th Dist.), quoting *Einhorn v. Ford Motor Co.*, 48 Ohio St.3d 27, 30 (1990).

{¶ 82} Absent an abuse of discretion, the trial court's determination of attorney fees will not be disturbed on appeal. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 145 (1991). *See also Estate of Shury v. Cusato*, 2024-Ohio-2066, ¶ 7 (8th Dist.). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Abdullah v. Johnson*, 2021-Ohio-3304, ¶ 35. An abuse of discretion is "'more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *W.A.F.P., Inc. v. Sky Fuel Inc.*, 2024-Ohio-3297, ¶ 13 (8th Dist.), quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 83} In *Bittner*, the Ohio Supreme Court explained:

> It is well settled that where a court is empowered to award attorney fees by statute, the amount of such fees is within the sound discretion of the trial court. Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere. The trial judge which participated not only in the trial but also in many of the preliminary proceedings leading up to the trial has an infinitely better opportunity to determine the value of services rendered by lawyers who have tried a case before him than does an appellate court.

*Id.* at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist. 1985).

{¶ 84} Defendants raised three arguments in support of this assignment of error. First, they contend the award of fees and costs must be vacated or modified because they dispute that there was any violation of the CSPA. As demonstrated, we

are upholding the trial court's finding of liability for violations of the CSPA. Consequently, this argument is not well-taken.

{¶ 85} With their second and third arguments, the Defendants claim that Caldwell should not be entitled to fees associated with the first trial of this case because they prevailed in the appeal of that first trial and that Caldwell did not provide "substantive support" for her attorney's rates or hours worked. We disagree with each of these related arguments.

{¶ 86} Recovery of attorney fees under R.C. 1345.09(F)(2) is limited to "work reasonably performed on the CSPA claim." *Estate of Shury*, 2024-Ohio-2066, at ¶ 9 (8th Dist.), citing *Bittner*, 58 Ohio St.3d 143. "A determination of attorney fees starts with establishing the number of hours reasonably expended on the litigation multiplied by a reasonable hourly fee," which is often referred to as the "lodestar." (Cleaned up.) *Id.*

{¶ 87} The trial court specifically found that the fees and costs associated with the first trial "were reasonably necessarily incurred to obtain the judgment in this matter." Further, the trial court found that counsel's rates were reasonable based upon the evidence in the record demonstrating his years of experience and the nature of his practice. Finally, the trial court concluded that the evidence submitted demonstrated that "the number of hours worked were reasonable given the issues involved and the progression of the case."

{¶ 88} We find that the Defendants have not demonstrated that the trial court abused its discretion in awarding the attorney fees and costs it did. The

substantive legal claims put forward in the first trial were the same as the second trial. The first appeal related solely to the question of the proper treatment of requests for admissions. Consequently, legal work done in connection with the first trial would be relevant to the second trial. Fees and costs totaling $20,627.50 related to the work performed in connection with the first trial. The court awarded just $6,490.40 in fees and costs incurred since October 30, 2020, after first trial. The evidence before the trial court included a breakdown of the hours worked and description of the work performed. As demonstrated by the fee breakdown provided by Caldwell's counsel, he did not simply duplicate the work that had been done for the first trial. The fees awarded are neither so high nor so low as to "shock the conscience."

{¶ 89} Accordingly, we overrule the Defendants' seventh assignment of error.

## C. Manifest Weight of the Evidence

{¶ 90} The Defendants' tenth assignment of error asserts that "the trial court's holding was against the manifest weight of the evidence." The Defendants' argument addresses only Caldwell's claims for civil conspiracy, fraud, and CSPA violations. A careful reading of the Defendants' appellate brief reveals that there is no challenge to the weight of the evidence regarding Caldwell's breach-of-contract claim.

{¶ 91} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the

state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, *Thompkins*, 78 Ohio St.3d at 386-387. The manifest-weight standard is the same in a civil case as in a criminal case. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17.

> The [reviewing] court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.

(Cleaned up.) *Id.* at ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. Reversal on manifest-weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 92} Defendants do not argue about the weight of the evidence of civil conspiracy or fraud. Instead, they argue that that Caldwell "offered no evidence" to support either. Having found a lack of sufficient evidence to support either civil conspiracy or fraud, this aspect of Defendants' tenth assignment of error is moot. *See State v. Jenkins*, 2025-Ohio-5146, ¶ 10 (8th Dist.) (after sustaining the first assignment of error, the remaining assignments of error were rendered moot).

{¶ 93} As for Caldwell's claims for violation of the CSPA, Defendants again argue that Caldwell "never engaged in any transaction with [Acorn]." Further, Defendants claim that Allen lied when he told Caldwell that he worked for Acorn and that the evidence of a relationship between Acorn and Allen was "highly circumstantial at best."

{¶ 94} At trial, the finder of fact is in the "best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.).

{¶ 95} Here, the court considered the parties' testimony and concluded that Lawrence was not credible, while Caldwell and others were credible. The court concluded:

> Lawrence's testimony in regard to the HVAC project and his relationship with Charles Allen was generally not credible, for multiple reasons. First, Mr. Lawrence has repeatedly contradicted his prior sworn testimony and interrogatory responses in regard to material issues and has done so on multiple occasions without reasonable explanation. Second, Mr. Lawrence's explanation of events did not make sense and have not remained consistent throughout this litigation. Third, Mr. Lawrence testified to shredding, destroying, or otherwise failing to produce copies of multiple critical documents. (Tr. 86:8-87:1; 97:14-22). Fourth, Mr. Lawrence's testimony was contradicted by testimony from a witness this Court found to be more credible, Samantha Vajskop, on the key issue of Mr. Lawrence's knowledge and dealings with former Defendant Charles Allen. Samantha Vajskop was found to be a credible witness. Ms. Caldwell was also found to be credible witness.

{¶ 96} As for Defendants' concern regarding the "circumstantial" evidence of a relationship between Allen and Acorn, "[a]lthough circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence." *State v. Wisniewski*, 2021-Ohio-3031, ¶ 23 (8th Dist.). As discussed, sufficient evidence was presented to the trial court to support the finding

that Allen was an employee or agent of Acorn. The evidence weighing against that finding was provided by Lawrence, who the court found to be not credible.

{¶ 97} Under these circumstances, we do not find that Defendants demonstrated this is the exceptional case in which the evidence weighs heavily against a finding of liability on Caldwell's claim for violation of the CSPA. Defendants' tenth assignment of error is overruled.

## D. Conclusion

{¶ 98} In summary, the evidence presented at trial showed that Acorn pulled a Permit for HVAC work at the Property in anticipation of getting the job. Caldwell expressly contracted with Allen for the HVAC work, and through the extension of apparent authority, we find that she also contracted with Acorn. Further, evidence at trial established that Allen was an employee or agent of Acorn. Caldwell paid Allen $4,500, and neither Allen nor Acorn performed the work. In light of the evidence in the record, we find,

- The Defendants' fourth and fifth assignments of error are overruled regarding the admission of evidence.

- Sufficient evidence was not presented to demonstrate that Lawrence was individually liable; the Defendants' first, eighth, and ninth assignments of error are sustained as relates to the finding that Lawrence was individually liable.

- Sufficient evidence was presented to support Caldwell's claim for breach of contract against Acorn; the Defendants' first and ninth assignments of error are overruled as relates to the trial court's judgment on Caldwell's breach-of-contract claim against Acorn.

- Sufficient evidence was presented to support Caldwell's claim for violations of the CSPA against Acorn; the Defendants' first, sixth, and ninth assignments of error are overruled as relates to

Caldwell's CSPA claim against Acorn with the exception of the finding of a violation of OAC 109:4-3-10(A) because it was discussed in connection with assignments of error Nos. 3 and 6.

- Sufficient evidence was not presented to support Caldwell's claim of a civil conspiracy to commit fraud or misrepresentation in violation of OAC 109:4-3-10(A); the Defendants' first, second, third, and ninth assignments of error are sustained as relates to Caldwell's claim for civil conspiracy to commit fraud. The award of punitive damages and the award of statutory damages for violation of OAC 109:4-3-10(A) are vacated.

- The trial court's award of attorney fees is supported by sufficient evidence and assignment of error seven is overruled.

- The trial court's judgment was not against the manifest weight of the evidence; the Defendants' tenth assignment of error is overruled.

{¶ 99} Judgment affirmed in part, reversed in part, and remanded to the trial court for proceedings consistent with this opinion.

It is ordered that the parties share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR